## DUNCAN *against* REIFF.

### IN ERROR.

Whatever may have been the effect of a judicial sale on other interests, both the policy and the practice of the legislature have been to hold the lien of a mortgage, to the state undischarged by any thing but actual payment into the treasury; and such mortgage is not divested by a judicial sale, on any other lien of the land mortgaged, nor is it to be paid out of the purchase money raised by such sale.

ERROR to the District Court of *York* county.

This was a case stated in nature of a special verdict, by which the only question presented was whether a judicial sale of land, mortgaged to the commonwealth, for the purchase money, made upon another lien, divested the mortgage, and was entitled to be paid out of the proceeds of such sale.

*Evans* for the plaintiff in error.
*Lewis, contra.*

The opinion of the court was delivered by

GIBSON C. J.—The practice of the state has ever been to retain an indissoluble lien on the land itself, without regard to the manner in which the debt to be secured was created. This was distinctly manifested in the loan office Act, passed the twenty-sixth of February, seventeen hundred and eighty-three, on the special provisions of which was decided, *Febeger's lessee,* v. *Craighead,* 2 *Yates,* 42, whose principles were lately scanned with care in the case of *The Corporation for the relief of Presbyterian Clergymen* v. *Wallace,* in which the decision went no further, however, than to determine the effect of a judicial sale on the lien of a mortgage whose properties were not regulated by statute. Neither the Acts of the fourth of April, eighteen hundred and five, and the twenty-first of February, eighteen hundred and ten, in accordance with which the mortgage before us was given, nor that of the first of March, eighteen hundred and eleven, to encourage the patenting lands, north and west of the Allegheny river and Conewango creek, expressly or by necessary implication define the qualities of a mortgage for purchase money, further than the intent of the legislature in that respect, may be supposed to have been guided by the policy uniformly evinced in similar cases, of which, however, the legislation that grew out of the dispute between this state and Connecticut, affords a happy illustration. In the compromising Act, passed the fourth of April, seventeen hundred and ninety-nine, patents were ordered to be issued to Connecticut settlers, on security being given by mortgage for the purchase money, but without expressly defining the force and durability of its lien. But the pre-

(Duncan *v.* Reiff.)

eise intent of the legislature on this subject, was explained by a sup-
pletory Act, passed the fourth of April, eighteen hundred and five,
in which the patents were directed to be issued to Connecticut set-
tlers, who might "desire such lands to remain as a security for the
payment of the purchase money" without being willing to incur the
expense of a mortgage, the Surveyor General certifying on the back
of the patents, the amount and the periods when payable; "which
sums" it was enacted, "shall remain a lien on the land in the nature
of a mortgage, UNTIL THE MONEY SHALL HAVE BEEN PAID." Here
then is a legislative exposition of the nature of a mortgage to the
state.    In fact the state has seldom accepted of any other security
than the land itself.    In a very few instances both bonds and mortga-
ges have been required; as by the Act of the sixteenth of September,
seventeen hundred and eighty-five, for the price of lands purchas-
ed before the tenth of December, seventeen hundred and seventy-
six, and also by the Act of the thirtieth of March, eighteen hundred
and twenty-two, which directed sale to be made of the lands ceded
by Dickenson College.    In the case of the lands of *John Nicholson*,
sold on the lien of the Commonwealth, for defaults by him in the
office of Comptroller General, the sale was on terms which required
the purchaser to give bond *without* a mortgage; but the land was
expressly charged with its price in the hands of the purchaser, and
this affords another proof of the uninterrupted course of the policy
of which I have spoken.    In the case of the estates forfeited and di-
rected to be sold by the Act of attainder, passed the sixth of March
seventeen hundred and seventy-eight, and of the depreciation lands
sold at the Philadelphia coffee-house, under the Act of the twelfth
of March seventeen hundred and eighty-three, for the redemption
of the certificates issued to the officers and soldiers of the Pennsyl-
vania line, the title was withheld till the purchase money was paid.
All these examples shew that although there have been a few instan-
ces of superadded personal liability, the state has always looked to
the land as debtor.    Nor has it ever confided the receipt or custo-
dy of its monys to any but its particular officers or agents. Here, if the
lien were divested, the public interest would be put to the hazard of
the sheriff's insolvency, which sometimes occasions loss even to in-
dividuals notwithstanding extreme diligence by the losers.    The
Commonwealth necessarily performs its operations by the instru-
mentality of agents, and consequently with less vigilance than is
infused by self-interest into the operations of an individual; and it
is for that reason instead of any approximation of its attributes and
prerogatives to those of royalty, that the maxim of *nullum tempus*
is held applicable to it: so that the same consideration would seem
to entitle it to a more indulgent construction in other matters, than
could be claimed by an individual.    Whatever, therefore may have
been the effect of a judicial sale on other interests, both the policy
47

and the practice of the legislature have been to hold the lien of a mortgage to the state, undischarged by any thing but actual payment into the treasury; consequently, the mortgage to the governor, mentioned in the case stated, is not to be paid out of the proceeds of the sale.

Judgment affirmed. ·